**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| **HEALTHCARE SERVICES GROUP, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. _____** |
| **PROFESSIONAL RESOURCES MANAGEMENT OF RABUN, LLC,** | ) ) ) ) | |
| **Defendant.** | ) ) ) | |

## COMPLAINT

Plaintiff, Healthcare Services Group, Inc. ("HCSG" or "Plaintiff"), by and through its undersigned counsel, complaining against Defendant, Professional Resources Management of Rabun, LLC ("Defendant"), and avers as follows.

## The Parties

1.     HCSG is a Pennsylvania corporation with its principal place of business located at 3220 Tillman Drive, Suite 300, Bensalem, Pennsylvania 19020.

2.     Defendant is a Georgia limited liability company with its principal place of business located at 162 Legacy Point, Clayton, Georgia 30525. Defendant operates a skilled nursing facility (the "Facility") at that address.

## Jurisdiction and Venue

3.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of the Commonwealth of Pennsylvania; the Defendant is a citizen of Alabama.

4.     For purposes of diversity of citizenship analysis, the state of citizenship for corporations is the state of incorporation or its principal place of business.

5.     HCSG, a Pennsylvania corporation with its principal place of business in Pennsylvania, is a citizen of Pennsylvania for purposes of diversity of citizenship subject matter jurisdiction.

6.     For purposes of diversity of citizenship analysis, the state of citizenship of limited liability companies is determined by the citizenship of their members.

7.     Defendant is a limited liability company formed in Georgia. Upon information and belief, the membership interests of Defendant are held by two partnerships: (i) Jacques Jarry Family Limited Partnership ("Jacques Jarry Partnership"), 400 Wiltshire Drive, Montgomery, AL 36117; and (ii) Vicki Lawrenson Family Partnership ("Vicki Lawrenson Partnership"), 648 Horseshoe Curve, Pike Road, AL 36617.

8.     Upon information and belief, the general partner of the Vicki Lawrenson Partnership is Vicki Lawrenson, a citizen of Alabama. Upon information

and belief, the general partner of the Jacques Jerry Partnership is Jacques Jarry, a citizen of Alabama. Thus, for purposes of federal diversity jurisdiction, the Defendant is a citizen of the same state as its individual owners, to wit, Alabama.

9.     Federal subject matter jurisdiction exists in this case because Plaintiff is a citizen of Pennsylvania and Defendant is a citizen of Alabama and the amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000), in the aggregate.

10.     This Court has personal jurisdiction over the Defendant because, in the operative contracts attached hereto, the Defendant expressly consented to exclusive jurisdiction and venue in Georgia. Moreover, the Defendant is subject to personal jurisdiction in Georgia, and purposefully availed itself to jurisdiction, by conducting business in Georgia and formulating its business entity in this state.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) the Defendant consented to venue in this District; (ii) a substantial part of the events or omissions occurred in this District or, alternatively, (iii) the Defendant is subject to personal jurisdiction in this District.  Defendant operates the Facility in this District.

## COUNT I – BREACH OF HOUSEKEEPING AGREEMENT

12.     HCSG incorporates by reference the preceding paragraphs as if set forth herein at length.

13.     On August 18, 2020, HCSG and Defendant entered into a Housekeeping Service Agreement (the "Housekeeping Agreement"). A true and correct copy of the Housekeeping Agreement is attached hereto, made a part hereof, and marked as **Exhibit "A."**

14.     Pursuant to the Housekeeping Agreement, HCSG agreed to provide, among other things, the requisite management, labor and supplies necessary to provide housekeeping services for Defendant at the Facility.

15.     Pursuant to the Housekeeping Agreement, Defendant was required to pay a fee in an amount specified in the Housekeeping Agreement for the housekeeping services provided by HCSG.

16.     Pursuant to the Housekeeping Agreement, Defendant was invoiced for services on the first day of the week in which services were rendered.

17.     Defendant has failed and refused to pay HCSG for all housekeeping services provided by HCSG.

18.     The failure of Defendant to make payments to HCSG when due constitutes a material breach of the Housekeeping Agreement.

19.     As a direct and proximate result of Defendant's breach of its contractual duties, HCSG has been and continues to be damaged.

20.     Defendant accepted the services performed by HCSG.

21.     By letter dated April 22, 2021, HCSG demanded the payment in full of all outstanding obligations to HCSG under the Housekeeping Agreement.

22.     Despite demand, Defendant has failed and refused to pay the outstanding obligations owed to HCSG.

23.     The Housekeeping Agreement provides that HCSG shall be entitled to recover attorneys' fees incurred in enforcing the Housekeeping Agreement.

24.     The Housekeeping Agreement provides further that late charges accrue on amounts not timely paid at the rate of 1.5% per month.

25.     As of April 29, 2021, the total outstanding past due indebtedness owed by Defendant to HCSG pursuant to the Housekeeping Agreement was $49,226.50.

26.     All conditions precedent to asserting claims against Defendant have been satisfied.

WHEREFORE, Plaintiff, Healthcare Services Group, Inc., demands that judgment be entered in its favor, and against Defendant, Professional Resources Management of Rabun, Inc., in the amount of $49,226.50, for the damages due under the Housekeeping Agreement, together with post-judgment interest at the statutory

rate, late charges, interest, reasonable attorneys' fees and costs and such other and further relief that this Court deems necessary and just.

### COUNT II – BREACH OF DINING AGREEMENT

27.     HCSG incorporates by reference the preceding paragraphs as if set forth herein at length.

28.     On August 18, 2020, HCSG and Defendant entered into a Fixed and Variable Dining Service Agreement (the "Dining Agreement"). A true and correct copy of the Dining Agreement is attached hereto, made a part hereof, and marked as **Exhibit "B."**

29.     Pursuant to the Dining Agreement, HCSG agreed to provide, among other things, the requisite management, labor and supplies necessary to provide dining services for Defendant at the Facility.

30.     Pursuant to the Dining Agreement, Defendant was required to pay a fee in an amount specified in the Dining Agreement for the dining services provided by HCSG.

31.     Pursuant to the Dining Agreement, Defendant was invoiced for services on the first day of the week in which services were rendered.

32.     Pursuant to the Dining Agreement, Defendant was required to pay a variable fee to cover the cost of food, supplements, and supplies, such fee being HCGS's costs to procure those supplies plus a five percent (5%) administrative fee.

33.     Pursuant to the Dining Agreement, Defendant was invoiced for the variable fee after the close of each month.

34.     Defendant has failed and refused to pay HCSG for all dining services provided by HCSG.

35.     The failure of Defendant to make payments to HCSG when due constitutes a material breach of the Dining Agreement.

36.     As a direct and proximate result of Defendant's breach of its contractual duties, HCSG has been and continues to be damaged.

37.     Defendant accepted the services performed by HCSG.

38.     By letter dated April 22, 2021, HCSG demanded the payment in full of all outstanding obligations under the Dining Agreement.

39.     Despite demand, Defendant has failed and refused to pay the outstanding obligations owed to HCSG.

40.     The Dining Agreement provides that HCSG shall be entitled to recover attorneys' fees incurred in enforcing the Dining Agreement.

41.     The Dining Agreement provides further that late charges accrue on amounts not timely paid at the rate of 1.5% per month.

42.     As of April 29, 2021, the total outstanding past due indebtedness owed by Defendant to HCSG pursuant to the Dining Agreement was $56,094.66.

43.     All conditions precedent to asserting claims against the Defendant have been satisfied.

WHEREFORE, Plaintiff, Healthcare Services Group, Inc., demands that judgment be entered in its favor, and against Defendant, Professional Resources Management of Rabun, Inc., in the amount of $56,094.66, for the damages due under the Dining Agreement, together with post-judgment interest at the statutory rate, late charges, interest, reasonable attorneys' fees and costs and such other and further relief that this Court deems necessary and just.

## COUNT III
## UNJUST ENRICHMENT

44.     HCSG incorporates by reference the preceding paragraphs as if set forth herein at length.

45.     Should it be determined that HCSG cannot proceed against Defendant on claims for breach of contract, then this Count is specifically pled in the alternative pursuant to Fed. R. Civ. P. 8(a).

46.     HCSG provided services at the Facility for Defendant at Defendant's request and insistence and then failed to pay for such services.

47.     Defendant accepted the services and knew, or should have known, that HCSG expected to be paid for such services.

48.     HCSG demanded payment for the reasonable value for such services. However, payment has not been made.

49.     If Defendant fails to pay the reasonable value of the services, it will be unjustly enriched.

50.     It would be unjust and inequitable to permit Defendant to continue to enjoy the benefits of the services to the detriment of HCSG.

51.     As a result of Defendant's wrongful refusal to satisfy its obligations, Plaintiff has been deprived of the reasonable value of its services and goods.

**COUNT IV**
**O.C.G.A. § 13-6-11 ATTORNEYS' FEES**

52.     HCSG incorporates by reference the preceding paragraphs as if set forth herein at length.

53.     Defendant has acted in bad faith, has been stubbornly litigious, and has caused HCSG unnecessary trouble and expense.

54.     HCSG is entitled to recover from Defendant HCSG's expenses of litigation, including reasonable attorneys' fees, under O.C.G.A. § 13-6-11, in an amount to be proven at trial.

WHEREAS, Plaintiff Healthcare Services Group, Inc. demands judgment in its favor and against Defendant, Professional Resources Management of Rabun, Inc., together with attorneys' fees, interest and costs and such other and further relief as this Court deems necessary and just.

Respectfully submitted this 20th day of May, 2021.

/s/ Patrick Silloway
Patrick Silloway
Georgia Bar No. 971966
psilloway@balch.com

**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd. N.W.
Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

*Attorney for Plaintiff, Healthcare Services Group, Inc.*

## <u>CERTIFICATE OF COUNSEL REGARDING FONT SIZE</u>

Counsel certifies that the foregoing has been prepared using Times New Roman font size 14 in accordance with Local Rules 5.1(C) and 7.1(D).

This 20th day of May, 2021.

/s/ Patrick Silloway
Patrick Silloway
Georgia Bar No. 971966

# **EXHIBIT A**

DocuSign Envelope ID: A72B4E98-21E3-47E3-A948-BE33BB5D8604

ABA Number: 031-0000-53
Account: 84-0072-9868
Name: Healthcare Services Group, Inc.

3.3     **Additional Services**. To the extent Client requests, and HCSG agrees to provide, goods or services not included in the Services and HCSG does provide such additional goods and services, HCSG shall submit an invoice to the Client reflecting the fee for such additional goods and services.  Payment on such supplemental invoices or "Re-Bills" shall be due and payable 14 days after receipt by the Client.

3.4     **Annual Increase**.  The Service Fee for each year shall automatically increase annually by an amount equal to three percent (3%) of the Service Fee for the prior year ("Annual Increase").  Such Annual Increase shall be reflected each year beginning with the invoice for the week in which the anniversary of the Start Date occurs.

3.5     **Pass Through Amounts**.

(a)     In addition to the Service Fee, HCSG shall automatically pass through to Client any employment-related costs and increases imposed by federal, state or local governmental authorities, or any applicable union contract ("Pass Through Amounts"). Pass Through Amounts shall include, but shall not be limited to, costs related to the following: (i) a change to existing or new federal, state or local payroll taxes (including changes to any payroll based taxes or withholdings such as FICA, SUI, and/or FUTA); (ii) a change related to unionization of relevant department employees (whether an initial collective bargaining agreement, amendments to an existing collective bargaining agreement, wage-reopeners or the negotiation of a subsequent, successor collective bargaining agreement); (iii) an increase in the minimum wage rate, minimum salary level for exempt employees, the enactment of any "living wage" laws, or any other wage or salary increase imposed by any governmental entity; and/or (iv) new or additional fees, taxes, assessments or other charges or costs incurred by HCSG arising out of changes to existing or new federal, state or local legislation or legal requirements related to employee medical insurance or other employee benefits.

(b)     It is understood between the Parties that, in the event of a mandated minimum wage or salary increase that affects some HCSG employees, the wages of all HCSG employees will be increased by the same percentage as the increase to the minimum wage and that all such increases shall constitute Pass Through Amounts.  In the event the Service Fee is increased to account for the change in such costs, such increase shall be effective from the date such changes impose additional costs on HCSG.

3.6     **HCSG Reliance Upon Client Information**.  Client acknowledges that the Service Fee has been calculated in reliance upon information provided by or on behalf of Client.  If after sixty (60) days from the Start Date, HCSG determines that such information or HCSG's



DocuSign Envelope ID: A72B4F98-31E3-47E3-A048-BE33B5D8604

assumptions were inaccurate or inconclusive, HCSG shall have the right to adjust the Service Fee accordingly and, if Client objects to such adjustment, HCSG may terminate the agreement on thirty (30) days' written notice to Client.

3.7    **Purchasing**. In connection with the provision of Services, HCSG may purchase inventory, equipment and services from various vendors selected by HCSG in its sole discretion. HCSG will determine the specifications and quantities of such goods and services and may utilize its national account vendors or other vendors, some of which may be different than the Client's current vendors. The parties recognize that any purchasing incentives arising from HCSG's arrangements with such vendors shall inure to HCSG's sole benefit.

3.8    **Taxes**. The Service Fee does not include local, state, or federal sales, use, value-added, or other taxes or tariffs. Client shall pay all such taxes or tariffs as may be imposed upon HCSG or Client, except income taxes imposed on HCSG. Invoices submitted by HCSG to Client shall include any such taxes and tariffs that HCSG is required to pay on Client's behalf.

3.9    **Failure to Pay**. Client acknowledges that its failure to timely pay any amounts due hereunder, or any portion thereof, shall be a material breach of this Agreement for which HCSG may, in addition to pursuing all other remedies, immediately terminate this Agreement and/or cease providing Services. Client shall reimburse HCSG for all fees, costs and expenses incurred by HCSG (including reasonable attorneys' and other professionals' fees, costs and expenses, expert witness fees and the fees of any collection agency retained by HCSG) in exercising any of its rights under this Agreement or applicable law, whether before or after commencement of suit by HCSG and whether before or after commencement of bankruptcy or other insolvency related proceedings by the Client. The provision for any late charge herein shall not be construed to permit Client to make any payment after its due date, obligate HCSG to accept any overdue payment or affect HCSG's rights and remedies upon the occurrence of a breach of this Agreement.

3.10    **Reimbursed Funds**. The parties acknowledge that Client may seek reimbursement of costs and expenses related to the Services from state and federal government agencies. Client agrees to hold in trust for HCSG funds received from such agencies as reimbursement for the Services until such time as the Client's obligations to HCSG hereunder have been paid in full. Notwithstanding the foregoing, delay or absence of any reimbursement does not relieve Client of its obligation to make all payments due hereunder in accordance with the terms of this Agreement.

3.11    **Catastrophe**. HCSG shall not be liable for failure to perform its obligations under this Agreement when such failure is caused by fire, explosion, water, act of God, civil disorder or disturbance, strike, vandalism, war, riot, sabotage, weather and energy-related closing, governmental rules or regulations, failure of third parties to perform their obligations with respect to the Services, or like causes beyond the reasonable control of either party, or for real or personal property destroyed or damaged due to such causes.

4.     **TERM AND TERMINATION**.

4.1     **Term**.

(a)     Subject to subsection (b) below, the term of this Agreement shall be five (5) years commencing on the Start Date hereof, unless terminated earlier in accordance with the terms of this Agreement (together with any Renewal Term, the "Term"). This Agreement will renew automatically for subsequent five (5) years terms (each a "Renewal Term") unless a Party provides written notice of non-renewal at least ninety (90) days prior to expiration of the applicable Term.

(b)     If HCSG continues to provide Services beyond the Term, Client shall be liable for such Services on a daily basis in an amount equal to $1/365^{th}$ of the Service Fee plus amounts due for Re-Bills.

4.2     **Termination**.

(a)     By Client.

(i)     Client may not terminate this Agreement within the first one hundred twenty (120) days following the Start Date.

(ii)     Thereafter, Client may terminate this Agreement on sixty (60) days notice (the "Termination Notice") to HCSG with or without cause.

(iii)     No termination by Client shall be effective unless all amounts then due and owing to HCSG up to and including the date of the Termination Notice have been paid, with such amounts to include but not be limited to unpaid Start-Up Costs, Service Fees and Re-Bills. If payment for all amounts due and owing to HCSG as of the date of the Termination Notice is not received on the date such notice is received by HCSG, HCSG shall have the right to terminate this Agreement immediately. All other amounts due to HCSG shall be due and payable on the effective date of such termination.

(b)     By HCSG. HCSG may immediately terminate this Agreement in the event that:

(a)     Client fails to timely pay any sums due hereunder.  The parties acknowledge that time is of the essence with respect to all payments due hereunder;

(b)     Client fails to perform or observe any duty, obligation or covenant contained in this Agreement other than those set forth in subparagraph (b) (i) above and such

failure continues for thirty (30) days after written notice thereof is sent to Client in the manner specified in this Agreement; or

(c) (A) upon the insolvency of the Client; (B) upon the filing of a voluntary or involuntary petition under federal bankruptcy laws by or against the Client; (C) upon Client entering into an agreement with creditors for the liquidation of assets; (D) upon the appointment of a receiver or trustee to take charge of all assets of the Client; (E) upon the loss of license(s), permit(s) or accreditation(s) necessary to conduct the Client's businesses or to perform under this Agreement; (F) upon the loss or destruction of the Client's operations to such an extent that the Client can no longer carry out its business; or (G) upon HCSG's determination, in its commercially reasonable discretion, at any time, that its continued performance under this Agreement would be impractical or economically unfeasible.

## 5. **BANKRUPTCY RELATED MATTERS**.

5.1     In the event, during the Term hereof, the Client files a petition for relief under the United States Bankruptcy Code or is the subject of an involuntary petition for relief as to which an order for relief is entered (each a "Bankruptcy Event"), and in light of the fact that the nature of the Services are payroll and payroll-related, Client shall, within two (2) days of the occurrence of a Bankruptcy Event, file a motion (the "Critical Vendor Motion") to have HCSG deemed a "critical vendor" such that any prepetition amounts due and owing to HCSG shall be paid in full immediately upon entry of the order (the "Critical Vendor Order") granting the Critical Vendor Motion.

5.2     If any Bankruptcy Event occurs:  (a) if, from and after the date which is five (5) days after the occurrence of the Bankruptcy Event, a cash collateral order, financing order and/or other order acceptable to HCSG is not in force that allows for the payment by Client of all amounts billed or to be billed by HCSG hereunder on account of post-petition Services (the "Applicable Charges"), (b) if within two (2) days of the Bankruptcy Event the Client has not filed the Critical Vendor Motion or if within thirty (30) days of the Bankruptcy Event the bankruptcy court has not entered the Critical Vendor Order, (c) if within ten (10) days of the occurrence of the Bankruptcy Event an order approving a stipulation between HCSG and the Client, in form and content acceptable to HCSG, is not entered by the bankruptcy court which (i) allows for modification of this Agreement to provide for payment of Applicable Charges weekly in advance, and (ii) provides HCSG with immediate relief from the automatic stay in the event any payments on account of the Applicable Charges are not paid as and when due, or (d) if within sixty (60) days of the occurrence of the Bankruptcy Event, this Agreement is not assumed (including the cure of any monetary defaults), then, in each case, cause will exist to grant HCSG relief from the automatic stay to the extent necessary to terminate this Agreement and to deem this Agreement rejected.

6. **COMPLIANCE WITH LAWS**.  HCSG shall make commercially reasonable efforts to comply with all applicable federal, state and local laws and regulations (including minimum wage requirements) regarding employment, compensation, benefits and payment of its employees. HCSG will pay FICA, FUTA, worker's compensation, and all applicable payroll and other taxes for its employees.  Client shall comply with all laws applicable to its operation of the Facility.

7. **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION EMPLOYER.**

7.1  **No Discrimination**.  Neither party shall discriminate because of race, color, religion, sex, age, national origin, disability, sexual orientation, genetic information, or veteran status, or any other basis protected by applicable law, in the recruitment, selection, training, utilization, promotion, termination, or other employment related activities concerning the Services employees. The staffing, promotion, placement or assignment of employees who work on this account must be done without any preference or limitation based on race, color, religion, sex, age, national origin, disability, sexual orientation, genetic information, veteran status, or any other basis protected by applicable law.  This obligation applies to the recruitment, selection, training, utilization, promotion, termination or other employment-related activities concerning HCSG's employees.  Under no circumstances will HCSG permit a request or suggestion by a Client to place a particular employee in a Facility to override its non-discrimination policy or remove a particular employee from a Facility if HCSG believes such request may be considered violative of Section 7 hereunder.

7.2  **Compliance With Equal Opportunity Laws**.  HCSG affirms that it is an equal opportunity and affirmative action employer, is legally responsible for all of its employment decisions affecting its own employees, employees and shall comply with all applicable federal, state and local laws and regulations, including, but not limited to, Executive Order 11246; Rehabilitation Act of 1973; Vietnam Era Veterans Readjustment Assistance Act of 1974; Civil Rights Act of 1964; Equal Pay Act of 1963; Age Discrimination in Employment Act of 1967; Immigration Reform and Control Act of 1986; Public Law 95-507; the Americans With Disabilities Act; and any additions or amendments thereto.

8. **MISCELLANEOUS**.

8.1  **Services Quick Reference Guide**.  **Exhibit A-2** hereto is a memorandum containing a quick reference guide of certain Services to be provided pursuant to this Agreement (the "QRG").  The form and content of the QRG has been reviewed and approved by the parties and is intended to set forth a clear and accurate reference guide for the parties and their employees during the Term of this Agreement.  The QRG is intended to be a summary and a guide and not an integral and controlling part of this Agreement.  To the extent that the information set forth in the QRG conflicts with the Agreement, the terms of the Agreement shall govern.  The parties agree that the QRG should be conspicuously posted in the Facility where the parties' employees may see

6

## HOUSEKEEPING SERVICE AGREEMENT

THIS AGREEMENT ("Agreement"), made this 18th day of August, 2020 (the "Effective Date") by and between Healthcare Services Group, Inc. ("HCSG") a Pennsylvania corporation with offices at 3220 Tillman Drive, Suite 300, Bensalem, PA 19020, and Professional Resources Management of Rabun, LLC a Georgia Limited Liability Company ("Client") which respectively operates the Mountain Lakes Medical Center located at 162 Legacy Point, Clayton, GA 30525-4111 ("Facility").

The parties hereto, intending to be legally bound, agree as follows:

1.    **SCOPE OF WORK**.  Commencing on September 6, 2020 (the "Start Date"), HCSG will provide the services identified on **Exhibit A** hereto (the "Services") in accordance with the terms and conditions of this Agreement.

2.    **START-UP COSTS**. The parties acknowledge that certain costs and expenses will be incurred in preparation for the Start Date (the "Start-Up Costs"). The Client shall be responsible for the Start-Up Costs. The projected Start-Up Costs for the Facility are $0.00 (the "Projected Start-Up Costs") and are detailed on **Exhibit B** hereto.  Within 30-days of the Start Date, HCSG shall submit an invoice to the Client equal to the amount of the Projected Start-Up Costs, which shall be due and payable within 30-days of Client's receipt of such invoice.  Regardless of the amount of the Start-Up Costs, Client shall not be obligated to pay more than the amount of the Projected Start-Up Costs.

3.    **PRICING AND PAYMENT TERMS.**

3.1    **Service Fee**. As consideration for the Services identified on **Exhibit A**, Client shall pay HCSG an annual fee based on a 365-day year (the "Service Fee"), payable in weekly installments in the amount of $4,785.91 (the "Weekly Payment").

3.2    **Payment Terms.** HCSG shall issue an invoice to Client at the beginning of each week for Services rendered that week.  The Weekly Payment for the first invoice issued to Client shall be due on the first business day that is fourteen (14) days following the Start Date (the "Payment Due Date").  If the Payment Due Date falls on a non-business day, payment shall be due on the immediately preceding business day.  For the avoidance of doubt, the first Weekly Payment due hereunder shall be received by HCSG on 9/18/2020. The Weekly Payment for each subsequent invoice shall be due each week thereafter, on the same day of the week as the First Payment. Client agrees to pay a late charge of one and one half percent (1½%) per month, compounded monthly, for all amounts not paid timely. All payments shall be made via wire transfer according to the following instructions:

Bank: PNC Bank NA
Bank Address: Philadelphia, PA

it.

    8.2    **Notice**.  All notices, consents or other communications which either party is required to give to the other under this Agreement shall be in writing and shall be given by personal delivery or by deposit, postage prepaid, in the United States mail, certified or registered mail, return receipt requested, addressed to the parties at their respective address as set forth in the introductory paragraph hereto, and if to HCSG with a copy to: Healthcare Services Group, Inc., Legal Department, 3220 Tillman Drive, Suite 300, Bensalem, PA 19020.  Any notice sent in compliance with this provision shall be deemed to have been given upon the earlier of receipt or five (5) days after mail deposit, except that notice of change of address shall not be deemed effective until actually received by the intended recipient.

    8.3    **Cooperation with HHS**.  HCSG shall, until four years after the expiration of the Term, upon written request, make available to the Secretary of the Department of Health and Human Services ("HHS"), or the Secretary's duly authorized representative, or upon request to the Controller General or the Controller General's duly authorized representatives, this Agreement and such books, documents and records pertaining to Services provided during such contract year that are necessary to certify the nature and extent of costs under this Agreement.  The availability of HCSG's books, documents and records shall be subject at all times to such criteria and procedures for seeking or obtaining access as may be promulgated by the Secretary of HHS in regulations and other applicable laws.  HCSG's disclosure under this paragraph shall not be construed as a waiver of any legal rights to which HCSG or the Client may be entitled.  Each party will notify the other within ten days of receipt of a request for access.  If pursuant to this Agreement, any of HCSG's duties and obligations are to be carried out by any individual or entity under a contract with HCSG with a value of $10,000 or more over a twelve month period, and that subcontractor is to a significant extent, associated or affiliated with, owns, or is owned by or has control of or is controlled by HCSG, each such subcontractor shall itself be subject to the access requirements and HCSG shall require such subcontractor to meet the access requirements. Client also agrees to provide access to key personnel necessary to defend any claims asserted against HCSG by a third party arising from the provision of services hereunder.

    8.4    **Non-Solicitation of Managers**.  Each party recognizes and acknowledges that the other party's management personnel (e.g., account, area, key, district, regional, and divisional managers and supervisors, and directors of operations, vice presidents, consultants, dietitians, etc.) ("Management Personnel") are essential to such party's respective business and that such persons are familiar with such party's confidential and proprietary information (including without limitation such party's operating and organizational procedures).  As such, each party agrees, during the Term of this Agreement and for a period of one (1) year after a proper termination of this Agreement, to not hire, solicit for hire, permit the hiring of directly or indirectly (e.g. through an affiliated or subcontracted entity) Management Personnel: (i) still employed by the other; or (ii) who had been employed by the other at any time within one (1) year before or after the termination of this Agreement.  Each party acknowledges that a breach of the obligations set forth in this

DocuSign Envelope ID: A72B4F98-21E3-47E3-A048-BF33B5D8604

paragraph would irreparably harm the other's business and leaves the other without an adequate remedy at law, and that the harmed party would be entitled to injunctive relief in addition to all other remedies available at law or in equity to enforce the terms of this paragraph. This paragraph is subject to all applicable federal and state laws and shall survive the termination of this Agreement.

8.5    **Choice of Law; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia. Client consents to exclusive jurisdiction and venue in Rabun County, Georgia.

8.6    **Binding Upon Successors**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors, personal representatives and assigns. This Agreement may not be assigned (i) by Client without the written consent of HCSG; and (ii) by HCSG without the written consent of Client, except to an HCSG wholly-owned or substantially-related entity.

8.7    **Authority**. The individuals executing this Agreement on behalf of their respective entities represent that they are authorized to sign this Agreement on behalf of such entity and that the other Party is relying on such representation.

8.8    **Agreement Supersedes**. This Agreement supersedes any and all other agreements related to the Services provided for herein, either oral or written between the Parties hereto with respect to the engagement of HCSG by the Client and contains all the covenants and agreements between the Parties with respect to its subject matter. This Agreement shall not impact or modify any other agreements between the Parties with respect to the payment of any existing debts or obligations owed by the Client to HCSG.

8.9    **Indemnification**. Each party shall indemnify and hold the other harmless from and against all claims, liability, loss and expenses, including reasonable costs, and collection expenses, which may arise because of the adjudicated sole gross negligence or sole gross misconduct of the indemnifying party in the performance of its obligations under this Agreement. Client shall also indemnify and defend HCSG for any and all claims, liability, loss and expenses, including reasonable costs, and attorney's fees, which may arise from any conduct of Client's vendors, independent contractors or third party agents. Notwithstanding the foregoing, with respect to property damage, for which the parties maintain a system of coverage of their respective property, each party hereto waives its rights of subrogation, and the rights of its subsidiaries and affiliates, to recover from the other party hereto and its subsidiaries and affiliates for loss or damage to such party's building, equipment improvements and other property resulting from fire, explosion or other cause typically covered in standard broad form property insurance policies. Further, neither party shall be liable to the other for any special losses, or consequential, incidental, indirect, punitive, or exemplary damages.

8.10    **Insurance**.

(a)     The Parties at their own cost and expense, but for the mutual benefit of each other, shall carry a comprehensive commercial general liability or product liability policy covering all operations by or on behalf of the other for bodily injury liability and property damage liability for coverage for:  premise and operations;  products completed operations;  contractual liability insuring the obligations assumed by subcontractor to this agreement;  broad form property damage (including completed operations);  explosion, collapses and underground hazards;  and  personal injury liability.

(b)     The comprehensive commercial general liability or product liability policy shall be for no less than $2,000,000 in the aggregate for completed operations and ongoing operations, and $1,000,000 per occurrence.

(c)     To the extent any vehicles are used for any purpose related to this Agreement, the parties shall carry Commercial General Liability Coverage for Business Auto Coverage for no less than a total of $1,000,000 in the aggregate for personal injury and property damage.

(d)     Workmen's Compensation Insurance as required by law.

(e)     All insurance provided for hereunder shall be effectuated under enforceable policies issued by insurers of recognized responsibility licensed to do business in the state in which the services are rendered.

(f)     The parties agree that they will be given 30 days prior written notice of any cancellation or material reduction of insurance under said policies at least 30 days prior to the expiration date of any policy required hereunder, the renewal or replacement policy for such insurance (or certificates thereof) shall be delivered to the other Party.

(g)     This insurance section shall take precedence over any of the other provisions in this Agreement. Parties agree that their respective insurance policies and programs shall be the primary insurance policy ahead of any additional insured policies and the indemnity obligations of HCSG and Client set forth in Section 8.9. Nothing in this Agreement should be construed to require satisfaction of a Self-Insured Retention, if applicable. The Parties agree to waive subrogation to the extent any insurance may cover the loss.

8.11    **Counterparts; Electronic Signatures.**    This Agreement may be executed in counterparts, each of which together shall be deemed an original, but all of which, taken together, shall constitute one and the same agreement.  Either party may execute and deliver this Agreement by signing the same and sending a copy thereof to the other by facsimile or other electronic transmission. Such facsimile or other electronic document, including the signatures thereon, shall be treated in all respects as an original instrument bearing an original signature.

8.12    **Protected Health Information**. If HCSG or any of its officers, employees, agents or contractors receive any individually identifiable health information of any patients of the Client ("Protected Health Information" or "PHI") pursuant to its Services hereby provided, or

creates or receives any PHI on behalf of the Client, then HCSG shall maintain the security and confidentiality of such PHI as required by applicable laws and regulations, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH") and the regulations promulgated thereunder to the extent that HCSG is a "business associate" of the Client as that term is defined in HIPAA and/or HITECH.

8.13     **Proprietary Information**. During the term of this Agreement, the Client acknowledges that it may acquire, be exposed or obtain access to information considered confidential, including but not limited to strategies, operations, or trade secrets of HCSG ("Proprietary Information"). All Proprietary Information is confidential to HCSG and at all times will be HCSG's sole and exclusive property. In the event the Client receives, obtains access or otherwise is exposed to any Proprietary Information, Client will, and shall cause its officers, employees and agents to: (i) hold the Proprietary Information in trust and in strictest confidence; (ii) not produce, use, copy, distribute or otherwise disseminate the Proprietary Information except to the extent necessary to aid HCSG in performing the Services; and (iii) otherwise protect the Proprietary Information from disclosure. Upon request by HCSG, and in any event upon termination of this Agreement, the Client shall return all property belonging to HCSG that is in that party's custody, control or possession, including all materials containing Proprietary Information.

8.14     **Disclosure**. Disclosure of Proprietary Information by the Client will not be made to anyone except as necessary for performance of HCSG's Services on a specific need to know basis to those who have agreed to hold the Proprietary Information in trust and strictest confidence in accordance with the terms of this Section 8.14. The Client will take reasonable precautions to prevent disclosure of Proprietary Information to anyone without a need to know such Information.

*-SIGNATURES ON FOLLOWING PAGE-*

IN WITNESS WHEREOF, the duly authorized representatives of the Parties hereto have executed this Agreement as of the Effective Date.

Professional Resources Management of Rabun, LLC

Healthcare Services Group, Inc.

Signature: _Tammy Coll_
B2EDB4CAE5EA42F...

Signature: _[signature]_
ED088C0817A4404...

Name:   Tammy Coll

Name:   Matt Kirk

Title:   CEO

Title:   Regional Director

Date:   8/24/2020

Date:   8/24/2020

**EXHIBIT A**

HOUSEKEEPING SERVICES

This Exhibit is an integral part of the Agreement and is incorporated therein, and the scope of the Services is limited to the items included in this Exhibit A.  HCSG may provide other services at the request of Client for an additional fee (on which the parties will agree). Such billing for any extra services will be provided separately from the weekly Service Fee billed.

HCSG MANAGEMENT AND LABOR RESPONSIBILITIES

- Full time Account Manager to supervise the Services
- District Manager to oversee operation
- All staffing responsibility including:
  - Salaries/wages
  - Taxes
  - Fringe benefits
  - Company Uniforms
- Background checks for HCSG employees, at its cost, in compliance with applicable federal and state law
- Education and certification for HCSG employees, at its cost, as required by, and in compliance with applicable federal and state law
- 24/7 HR Hotline and HR support for HCSG Employees

HCSG PURCHASING RESPONSIBILITIES

Each of the housekeeping supplies and equipment listed below:

- Disinfectant Cleaner
- Metal Polish
- Chemical Dispensing System
- Germicidal Cleaner
- Neutral Quat Disinfectant
- Scrub Brushes
- All Purpose Degreaser
- Enzymatic Odor Eliminator
- Dust Mops, Handles, Cloths
- Bathroom Cleanser/Disinfectant
- Mops, Buckets  and Mop Handles
- Glass Cleaner  TB Disinfectant Cleaner

- Buff /Burnish/Stripping Pads
- General Purpose Cleaner
- Floor Stripper
- Carpet Bonnets
- Cream Cleanser
- Neutral Floor Cleaner
- Wet Floor and Caution Signs
- Furniture Polish
- Carpet Cleaner/Shampoo
- Floor Enhancer Spray
- Bleach/Bleach Wipes
- Floor Finishes
- Necessary supplementary tools for light housekeeping
- Facial tissue
- Toilet paper
- Paper Towels
- All plastic liners
- All name tags

EQUIPMENT RESPONSIBILITIES

On the Start Date, Client shall transfer to HCSG all housekeeping equipment located at the Facility which equipment shall thereafter be utilized and maintained by HCSG at its discretion and cost in performing the Services ("Housekeeping Equipment"). Upon termination of this Agreement, HCSG shall return to Client all Housekeeping Equipment which was located at the Facility as of the Start Date or provide Client with equipment of similar value.

CLIENT RESPONSIBILITIES

Client shall be responsible for all other supplies and materials including but not limited to the following:

- All hand soap
- All hand sanitizer
- All linen inventory at 3X PAR
-  All linen replacements
- All disposable gloves
- All room deodorizers and air fresheners
- Client shall bear the cost of all discretionary vaccines, other physical and medical exams and tests, and drug screenings not required by the applicable state and federal authorities administered to HCSG employees; provided, however HCSG shall reimburse the Client for the cost of influenza vaccinations administered to HCSG employees.

# **EXHIBIT A-2**

SERVICES QUICK REFERENCE GUIDE
(See next page)

DocuSign Envelope ID: A72B4E98-21E3-47E3-A948-BE33B5D8604



| QUICK REFERENCE GUIDE TO SERVICES | | | |
|---|---|---|---|
| **CATEGORY OF SERVICE** | **INCLUDED** | **NOT-INCLUDED BUT AVAILABLE FOR AN ADDITIONAL CHARGE** | **NOTES** |
| Background checks for HCSG employees | X | | |
| Vaccines for HCSG employees | | X | |
| Disinfectant Cleaner | X | | |
| Germicidal Cleaner | X | | |
| All Purpose Degreaser | X | | |
| Bathroom Cleanser/Disinfectant | X | | |
| Glass Cleaner | X | | |
| General Purpose Cleaner | X | | |
| Cream Cleanser | X | | |
| Furniture Polish | X | | |
| Bleach/Bleach Wipes | X | | |
| Degreaser | X | | |
| Metal Polish | X | | |
| Neutral Quat Disinfectant | X | | |
| Enzymatic Odor Eliminator | X | | |

| | | | |
|---|---|---|---|
| Laundry Detergents: Bleach, Softener, Destainer, Detergent | | X | |
| TB Disinfectant Cleaner | X | | |
| Floor Stripper | X | | |
| Neutral Floor Cleaner | X | | |
| Carpet Cleaner/Shampoo | X | | |
| Floor Finishes | X | | |
| Floor Sealer | X | | |
| Chemical Dispensing System | X | | |
| Scrub Brushes | X | | |
| Dust Mops, Handles, Cloths | X | | |
| Mops, Buckets and Mop Handles | X | | |
| Buff /Burnish/Stripping Pads | X | | |
| Carpet Bonnets | X | | |
| Wet Floor and Caution Signs | X | | |
| Floor Enhancer Spray | X | | |
| Necessary supplementary tools for light housekeeping | X | | |
| All paper products (unless otherwise identified) | | X | |
| All body soap | | X | |
| All hand soap | | X | |
| All hand sanitizer | | X | |
| All plastic liners | X | | |
| All linen inventory at 3X PAR, all linen | | X | |

| | | |
|---|---|---|
| replacements, and any other purchased linen services provided at or to Facility | | |
| All disposable gloves | | X |
| All room deodorizers and air fresheners | | X |
| All name tags | | X |
| All facial tissue | X | |
| All toilet paper | X | |

3

| QUICK REFERENCE GUIDE<br><br>TO SERVICES: CLEANING RESPONBILITIES | | | |
|---|---|---|---|
| **DESIGNATED AREA FOR CLEANING** | **INCLUDED** | **NOT-INCLUDED BUT AVAILABLE FOR AN ADDITIONAL CHARGE** | **NOTES** |
| [insert area name] | | | |
| [insert area name] | | | |
| [insert area name] | | | |
| [insert area name] | | | |
| [insert area name] | | | |
| [insert area name] | | | |
| [insert area name] | | | |

# **EXHIBIT B**

## START-UP COSTS

| Description | Amount |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

# EXHIBIT B

**DINING FIXED AND VARIABLE SERVICE AGREEMENT**

THIS AGREEMENT ("Agreement") is made this 18th day of August, 2020 (the "Effective Date") by and between Healthcare Services Group, Inc. ("HCSG"), a Pennsylvania corporation with offices at 3220 Tillman Drive, Suite 300, Bensalem, PA 19020, and Professional Resources Management of Rabun, LLC a Georgia limited Liability Company ("Client") which respectively operates the Mountain Lakes Medical Center located at 162 Legacy Point, Clayton, GA 30525-4111 ("Facility").

The parties hereto, intending to be legally bound, agree as follows:

1.      **SCOPE OF WORK**.  Commencing on September 6, 2020 (the "Start Date"), HCSG will provide the services identified on **Exhibit A** hereto (the "Services") in accordance with the terms and conditions of this Agreement.

2.      **PRICING AND PAYMENT TERMS.**

2.1      **Service Fee**.  As consideration for the Services identified on **Exhibit A**, Client shall pay HCSG a service fee (the "Service Fee"), as detailed below:

(a)      The portion of the Service Fee attributable to all labor and management related services shall be fixed at $3,216.26 per week ("Weekly Fixed Fee") and shall be payable weekly.

(b)      Variable Fee. The portion of the Service Fee attributable to food, supplements and supplies ("Food Supplies") shall be variable and billed as follows: After the close of a given month, Client shall receive an invoice, which reflects HCSG's Costs[1] to procure Food Supplies for the Client in that month plus an additional administrative fee of five percent (5%) ("Monthly Variable Fee").

2.2      **Payment Terms.**

(a)      Payment for Weekly Fixed Fee. HCSG shall issue an invoice to Client at the beginning of each week for the Weekly Fixed Fee for that week.  The payment for the first invoice issued to Client shall be due on the first day that is fourteen (14) days following the Start Date (the "Fixed Payment Due Date").  In the event that the Payment Due Date falls on a non-business day, payment shall be due on the immediately preceding business day.  For the

---

[1] "Costs" for a given month shall be defined herein as the actual amount invoiced to HCSG by its vendors during that month for Food Supplies.

1

**EXHIBIT B**

DocuSign Envelope ID: B0980745-44A9-483E-9E66-5BBA4EC83497D

avoidance of doubt, the first Weekly Payment due hereunder shall be received by HCSG on 9/18/2020 (the "First Payment"). The payment for each subsequent Weekly Fixed Fee shall be due each week thereafter, on the same day of the week as the First Payment.

(b)　　Payment for Monthly Variable Fee. Payment is due for the Monthly Variable Fee no later than fourteen (14) days from the date of the invoice (the "Variable Payment Due Date"). If the Variable Payment Due Date falls on a non-business day, payment shall be due on the immediately preceding business day.

(c)　　Client agrees to pay a late charge of one and one half percent (1½%) per month, compounded monthly, for all amounts not paid timely. All payments shall be made via wire transfer according to the following instructions:

> Bank: PNC Bank NA
> Bank Address: Philadelphia, PA
> ABA Number: 031-0000-53
> Account: 84-0072-9868
> Name: Healthcare Services Group, Inc.

2.3　　**Additional Services.** To the extent Client requests, and HCSG agrees to provide, goods or services not included in the Services and HCSG does provide such additional goods and services, HCSG shall submit an invoice to the Client reflecting the fee for such additional goods and services.  Payment on such supplemental invoices or "Re-Bills" shall be due and payable fourteen (14) days after receipt by the Client.

2.4　　**Annual Increase**. The Weekly Fixed Fee for each year shall automatically increase annually by an amount equal to three percent (3%) of the Weekly Fixed Fee for the prior year ("Annual Increase").  Such Annual Increase shall be reflected each year beginning with the invoice for the week in which the anniversary of the Start Date occurs.

2.5　　**Pass Through Amounts**.

(a)　　In addition to the Service Fee, HCSG shall automatically pass through to Client any employment-related costs and increases imposed by federal, state or local governmental authorities, or any applicable union contract ("Pass Through Amounts"). Pass Through Amounts shall include, but shall not be limited to, costs related to the following: (i) a change to existing or new federal, state or local payroll taxes (including changes to any payroll based taxes or withholdings such as FICA, SUI, and/or FUTA); (ii) a change related to unionization of relevant department employees (whether an initial collective bargaining

2

agreement, amendments to an existing collective bargaining agreement, wage-reopeners or the negotiation of a subsequent, successor collective bargaining agreement); (iii) an increase in the minimum wage rate, minimum salary level for exempt employees, the enactment of any "living wage" laws, or any other wage or salary increase imposed by any governmental entity; and/or (iv) new or additional fees, taxes, assessments or other charges or costs incurred by HCSG arising out of changes to existing or new federal, state or local legislation or legal requirements related to employee medical insurance or other employee benefits.

(b)     It is understood between the Parties that, in the event of a mandated minimum wage or salary increase that affects some HCSG employees, the wages of all HCSG employees will be increased by the same percentage as the increase to the minimum wage and that all such increases shall constitute Pass Through Amounts.  In the event the Service Fee is increased to account for the change in such costs, such increase shall be effective from the date such changes impose additional costs on HCSG.

2.6    **HCSG Reliance Upon Client Information**.  Client acknowledges that the Service Fee has been calculated in reliance upon information provided by or on behalf of Client. If after sixty (60) days from the Start Date, HCSG determines that such information or HCSG's assumptions were inaccurate or inconclusive, HCSG shall have the right to adjust the Service Fee accordingly and, if Client objects to such adjustment, HCSG may terminate the agreement on thirty (30) days' written notice to Client.

2.7    **Purchasing**. In connection with the provision of Services, HCSG may purchase inventory (including food), equipment and services from various vendors selected by HCSG in its sole discretion. HCSG will determine the specifications and quantities of such goods and services and may utilize its national account vendors or other vendors, some of which may be different than the Client's current vendors.  The parties recognize that any purchasing incentives arising from HCSG's arrangements with such vendors shall inure to HCSG's sole benefit.

2.8    **Taxes**. The Service Fee does not include local, state, or federal sales, use, value-added, or other taxes or tariffs.  Client shall pay all such taxes or tariffs as may be imposed upon HCSG or Client, except income taxes imposed on HCSG.  Invoices submitted by HCSG to Client shall include any such taxes and tariffs that HCSG is required to pay on Client's behalf.

2.9    **Failure to Pay**. Client acknowledges that its failure to timely pay any amounts due hereunder, or any portion thereof, shall be a material breach of this Agreement for which HCSG may, in addition to pursuing all other remedies, immediately terminate this Agreement

and/or cease providing Services.  Client shall reimburse HCSG for all fees, costs and expenses incurred by HCSG (including reasonable attorneys' and other professionals' fees, costs and expenses, expert witness fees and the fees of any collection agency retained by HCSG) in exercising any of its rights under this Agreement or applicable law, whether before or after commencement of suit by HCSG and whether before or after commencement of bankruptcy or other insolvency related proceedings by the Client. The provision for any late charge herein shall not be construed to permit Client to make any payment after its due date, obligate HCSG to accept any overdue payment or affect HCSG's rights and remedies upon the occurrence of a breach of this Agreement.

      2.10  **Reimbursed Funds**.  The parties acknowledge that Client may seek reimbursement of costs and expenses related to the Services from state and federal government agencies.  Client agrees to hold in trust for HCSG funds received from such agencies as reimbursement for the Services until such time as the Client's obligations to HCSG hereunder have been paid in full. Notwithstanding the foregoing, delay or absence of any reimbursement does not relieve Client of its obligation to make all payments due hereunder in accordance with the terms of this Agreement.

      2.11  **Catastrophe**. HCSG shall not be liable for failure to perform its obligations under this Agreement when such failure is caused by fire, explosion, water, act of God, civil disorder or disturbance, strike, vandalism, war, riot, sabotage, weather and energy-related closing, governmental rules or regulations, failure of third parties to perform their obligations with respect to the Services, or like causes beyond the reasonable control of either party, or for real or personal property destroyed or damaged due to such causes.

3.      **TERM AND TERMINATION**.

      3.1    **Term**.

          (a)    Subject to subsection (b) below, the term of this Agreement shall be five (5) years commencing on the Start Date hereof, unless terminated earlier in accordance with the terms of this Agreement (together with any Renewal Term, the "Term"). This Agreement will renew automatically for subsequent five (5) years terms (each a "Renewal Term") unless a Party provides written notice of non-renewal at least ninety (90) days prior to expiration of the applicable Term.

          (b)    If HCSG continues to provide Services beyond the Term, Client shall be liable for such Services on a daily basis in an amount equal to $1/365^{th}$ of the Service Fee plus amounts due for Re-Bills.

DocuSign Envelope ID: B0900745-44A9-483E-9E66-5BBA4EGB497D

3.2 **Termination**.

(a) <u>By Client</u>.

(i) Client may not terminate this Agreement within the first one hundred twenty (120) days following the Start Date.

(ii) Client may terminate this Agreement on sixty (60) days notice (the "<u>Termination Notice</u>") to HCSG with or without cause. Within one hundred twenty (120) days following the termination date, HCSG may issue a final invoice to Client for any cost incurred and not previously invoiced to Client during the Term of the Agreement. Payment for such invoice shall be due upon receipt of the invoice.

(iii) No termination by Client shall be effective unless all amounts then due and owing to HCSG up to and including the date of the Termination Notice have been paid, with such amounts to include but not be limited to unpaid Start-Up Costs, Service Fees and Re-Bills. If payment for all amounts due and owing to HCSG as of the date of the Termination Notice is not received on the date such notice is received by HCSG, HCSG shall have the right to terminate this Agreement immediately. All other amounts due to HCSG shall be due and payable on the effective date of such termination.

(b) <u>By HCSG</u>. HCSG may immediately terminate this Agreement in the event that:

(i) Client fails to timely pay any sums due hereunder. The parties acknowledge that time is of the essence with respect to all payments due hereunder;

(ii) Client fails to perform or observe any duty, obligation or covenant contained in this Agreement other than those set forth in subparagraph (b) (i) above and such failure continues for thirty (30) days after written notice thereof is sent to Client in the manner specified in this Agreement; or

(iii) (A) upon the insolvency of the Client; (B) upon the filing of a voluntary or involuntary petition under federal bankruptcy laws by or against the Client; (C) upon Client entering into an agreement with creditors for the liquidation of assets; (D) upon the appointment of a receiver or trustee to take charge of all assets of the Client; (E) upon the loss of license(s), permit(s) or accreditation(s) necessary to conduct the Client's businesses or to perform under this Agreement; (F) upon the loss or destruction of the Client's operations to such an extent that the

5

DocuSign Envelope ID: B0980745-44A9-483E-9E66-5BBA4EGB497D

Client can no longer carry out its business; or (G) upon HCSG's determination, in its commercially reasonable discretion, at any time, that its continued performance under this Agreement would be impractical or economically unfeasible.

4.  **BANKRUPTCY RELATED MATTERS**.

4.1     In the event, during the Term hereof, the Client files a petition for relief under the United States Bankruptcy Code or is the subject of an involuntary petition for relief as to which an order for relief is entered (each a "<u>Bankruptcy Event</u>"), and in light of the fact that the nature of the Services are payroll and payroll-related, Client shall, within two (2) days of the occurrence of a Bankruptcy Event, file a motion (the "<u>Critical Vendor Motion</u>") to have HCSG deemed a "critical vendor" such that any prepetition amounts due and owing to HCSG shall be paid in full immediately upon entry of the order (the "<u>Critical Vendor Order</u>") granting the Critical Vendor Motion.

4.2     If any Bankruptcy Event occurs:  (a) if, from and after the date which is five (5) days after the occurrence of the Bankruptcy Event, a cash collateral order, financing order and/or other order acceptable to HCSG is not in force that allows for the payment by Client of all amounts billed or to be billed by HCSG hereunder on account of post-petition Services (the "<u>Applicable Charges</u>"), (b) if within two (2) days of the Bankruptcy Event the Client has not filed the Critical Vendor Motion or if within thirty (30) days of the Bankruptcy Event the bankruptcy court has not entered the Critical Vendor Order, (c) if within ten (10) days of the occurrence of the Bankruptcy Event an order approving a stipulation between HCSG and the Client, in form and content acceptable to HCSG, is not entered by the bankruptcy court which (i) allows for modification of this Agreement to provide for payment of Applicable Charges weekly in advance, and (ii) provides HCSG with immediate relief from the automatic stay in the event any payments on account of the Applicable Charges are not paid as and when due, or (d) if within sixty (60) days of the occurrence of the Bankruptcy Event, this Agreement is not assumed (including the cure of any monetary defaults), then, in each case, cause will exist to grant HCSG relief from the automatic stay to the extent necessary to terminate this Agreement and to deem this Agreement rejected.

5.      **COMPLIANCE WITH LAWS**.  HCSG shall make commercially reasonable efforts to comply with all applicable federal, state and local laws and regulations (including minimum wage requirements) regarding employment, compensation, benefits and payment of its employees.  HCSG will pay FICA, FUTA, worker's compensation, and all applicable payroll and other taxes for its employees.  Client shall comply with all laws applicable to its operation of the Facility.

6.      **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION EMPLOYER.**

6.1      **No Discrimination**.  Neither party shall discriminate because of race, color, religion, sex, age, national origin, disability, sexual orientation, genetic information, or veteran status, or any other basis protected by applicable law, in the recruitment, selection, training, utilization, promotion, termination, or other employment related activities concerning the Services employees. The staffing, promotion, placement or assignment of employees who work on this account must be done without any preference or limitation based on race, color, religion, sex, age, national origin, disability, sexual orientation, genetic information, veteran status, or any other basis protected by applicable law.  This obligation applies to the recruitment, selection, training, utilization, promotion, termination or other employment-related activities concerning HCSG's employees.  Under no circumstances will HCSG permit a request or suggestion by a Client to place a particular employee in a Facility to override its non-discrimination policy or remove a particular employee from a Facility if HCSG believes such request may be considered violative of Section 6 hereunder.

6.2      **Compliance With Equal Opportunity Laws**.  HCSG affirms that it is an equal opportunity and affirmative action employer, is legally responsible for all of its employment decisions affecting its own employees, employees and shall comply with all applicable federal, state and local laws and regulations, including, but not limited to, Executive Order 11246; Rehabilitation Act of 1973; Vietnam Era Veterans Readjustment Assistance Act of 1974; Civil Rights Act of 1964; Equal Pay Act of 1963; Age Discrimination in Employment Act of 1967; Immigration Reform and Control Act of 1986; Public Law 95-507; the Americans With Disabilities Act; and any additions or amendments thereto.

7.      **MISCELLANEOUS**.

7.1      **Notice**.  All notices, consents or other communications which either party is required to give to the other under this Agreement shall be in writing and shall be given by personal delivery or by deposit, postage prepaid, in the United States mail, certified or registered mail, return receipt requested, addressed to the parties at their respective address as set forth in the introductory paragraph hereto, and if to HCSG with a copy to: Healthcare Services Group, Inc., Legal Department, 3220 Tillman Drive, Suite 300, Bensalem, PA 19020.  Any notice sent in compliance with this provision shall be deemed to have been given upon the earlier of receipt or five (5) days after mail deposit, except that notice of change of address shall not be deemed effective until actually received by the intended recipient.

7.2      **Cooperation with HHS**.  HCSG shall, until four years after the expiration of the

7

Term, upon written request, make available to the Secretary of the Department of Health and Human Services ("<u>HHS</u>"), or the Secretary's duly authorized representative, or upon request to the Controller General or the Controller General's duly authorized representatives, this Agreement and such books, documents and records pertaining to Services provided during such contract year that are necessary to certify the nature and extent of costs under this Agreement. The availability of HCSG's books, documents and records shall be subject at all times to such criteria and procedures for seeking or obtaining access as may be promulgated by the Secretary of HHS in regulations and other applicable laws.  HCSG's disclosure under this paragraph shall not be construed as a waiver of any legal rights to which HCSG or the Client may be entitled. Each party will notify the other within ten days of receipt of a request for access.  If pursuant to this Agreement, any of HCSG's duties and obligations are to be carried out by any individual or entity under a contract with HCSG with a value of $10,000 or more over a twelve month period, and that subcontractor is to a significant extent, associated or affiliated with, owns, or is owned by or has control of or is controlled by HCSG, each such subcontractor shall itself be subject to the access requirements and HCSG shall require such subcontractor to meet the access requirements. Client also agrees to provide access to key personnel necessary to defend any claims asserted against HCSG by a third party arising from the provision of services hereunder.

7.3    **Non-Solicitation of Managers**.  Each party recognizes and acknowledges that the other party's management personnel (e.g., account, area, key, district, regional, and divisional managers and supervisors, and directors of operations, vice presidents, consultants, dietitians, etc.) ("<u>Management Personnel</u>") are essential to such party's respective business and that such persons are familiar with such party's confidential and proprietary information (including without limitation such party's operating and organizational procedures).  As such, each party agrees, during the Term of this Agreement and for a period of one (1) year after a proper termination of this Agreement, to not hire, solicit for hire, permit the hiring of directly or indirectly (e.g. through an affiliated or subcontracted entity) Management Personnel: (i) still employed by the other; or (ii) who had been employed by the other at any time within one (1) year before or after the termination of this Agreement.  Each party acknowledges that a breach of the obligations set forth in this paragraph would irreparably harm the other's business and leaves the other without an adequate remedy at law, and that the harmed party would be entitled to injunctive relief in addition to all other remedies available at law or in equity to enforce the terms of this paragraph.  This paragraph is subject to all applicable federal and state laws and shall survive the termination of this Agreement.

7.4    **Choice of Law; Venue**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia. Client consents to exclusive jurisdiction and venue in the Rabun County, Gerorgia.

7.5    **Binding Upon Successors**.  This Agreement shall be binding upon and inure to

8

DocuSign Envelope ID: B0900745-44A9-483E-9E96-5BBA4EGB497D

the benefit of the Parties and their respective heirs, successors, personal representatives and assigns. This Agreement may not be assigned (i) by Client without the written consent of HCSG; and (ii) by HCSG without the written consent of Client, except to an HCSG wholly-owned or substantially-related entity.

7.6    **Authority**.  The individuals executing this Agreement on behalf of their respective entities represent that they are authorized to sign this Agreement on behalf of such entity and that the other Party is relying on such representation.

7.7    **Agreement Supersedes**.  This Agreement supersedes any and all other agreements related to the Services provided for herein, either oral or written between the Parties hereto with respect to the engagement of HCSG by the Client and contains all the covenants and agreements between the Parties with respect to its subject matter.  This Agreement shall not impact or modify any other agreements between the Parties with respect to the payment of any existing debts or obligations owed by the Client to HCSG.

7.8    **Indemnification**.  Each party shall indemnify and hold the other harmless from and against all claims, liability, loss and expenses, including reasonable costs, and collection expenses, which may arise because of the adjudicated sole gross negligence or sole gross misconduct of the indemnifying party in the performance of its obligations under this Agreement.  Client shall also indemnify and defend HCSG for any and all claims, liability, loss and expenses, including reasonable costs, and attorney's fees, which may arise from any conduct of Client's vendors, independent contractors or third party agents.   Notwithstanding the foregoing, with respect to property damage, for which the parties maintain a system of coverage of their respective property, each party hereto waives its rights of subrogation, and the rights of its subsidiaries and affiliates, to recover from the other party hereto and its subsidiaries and affiliates for loss or damage to such party's building, equipment improvements and other property resulting from fire, explosion or other cause typically covered in standard broad form property insurance policies. Further, neither party shall be liable to the other for any special losses, or consequential, incidental, indirect, punitive, or exemplary damages.

7.9    **Insurance**.

(a)    The Parties at their own cost and expense, but for the mutual benefit of each other, shall carry a comprehensive commercial general liability or product liability policy covering all operations by or on behalf of the other for bodily injury liability and property damage liability for coverage for:  premise and operations; products completed operations; contractual liability insuring the obligations assumed by subcontractor to this agreement;  broad form property damage (including completed operations);  explosion, collapses and underground hazards; and  personal injury liability.

(b)      The comprehensive commercial general liability or product liability policy shall be for no less than $2,000,000 in the aggregate for completed operations and ongoing operations, and $1,000,000 per occurrence.

(c)      To the extent any vehicles are used for any purpose related to this Agreement, the parties shall carry Commercial General Liability Coverage for Business Auto Coverage for no less than a total of $1,000,000 in the aggregate for personal injury and property damage.

(d)      Workmen's Compensation Insurance as required by law.

(e)      All insurance provided for hereunder shall be effectuated under enforceable policies issued by insurers of recognized responsibility licensed to do business in the state in which the services are rendered.

(f)      The parties agree that they will be given 30 days prior written notice of any cancellation or material reduction of insurance under said policies at least 30 days prior to the expiration date of any policy required hereunder, the renewal or replacement policy for such insurance (or certificates thereof) shall be delivered to the other Party.

(g)      This insurance section shall take precedence over any of the other provisions in this Agreement. Parties agree that their respective insurance policies and programs shall be the primary insurance policy ahead of any additional insured policies and the indemnity obligations of HCSG and Client set forth in Section 7.8. Nothing in this Agreement should be construed to require satisfaction of a Self-Insured Retention, if applicable. The Parties agree to waive subrogation to the extent any insurance may cover the loss.

7.10      **Counterparts; Electronic Signatures.**      This Agreement may be executed in counterparts, each of which together shall be deemed an original, but all of which, taken together, shall constitute one and the same agreement.  Either party may execute and deliver this Agreement by signing the same and sending a copy thereof to the other by facsimile or other electronic transmission. Such facsimile or other electronic document, including the signatures thereon, shall be treated in all respects as an original instrument bearing an original signature.

7.11      **Protected Health Information**. If HCSG or any of its officers, employees, agents or contractors receive any individually identifiable health information of any patients of the Client ("Protected Health Information" or "PHI") pursuant to its Services hereby provided, or creates or receives any PHI on behalf of the Client, then HCSG shall maintain the security and confidentiality of such PHI as required by applicable laws and regulations, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH") and the regulations promulgated thereunder to the extent that HCSG is a "business associate" of the Client as that term is defined

in HIPAA and/or HITECH.

7.12      **Proprietary Information**. During the term of this Agreement, the Client acknowledges that it may acquire, be exposed or obtain access to information considered confidential, including but not limited to strategies, operations, or trade secrets of HCSG ("Proprietary Information"). All Proprietary Information is confidential to HCSG and at all times will be HCSG's sole and exclusive property. In the event the Client receives, obtains access or otherwise is exposed to any Proprietary Information, Client will, and shall cause its officers, employees and agents to: (i) hold the Proprietary Information in trust and in strictest confidence; (ii) not produce, use, copy, distribute or otherwise disseminate the Proprietary Information except to the extent necessary to aid HCSG in performing the Services; and (iii) otherwise protect the Proprietary Information from disclosure. Upon request by HCSG, and in any event upon termination of this Agreement, the Client shall return all property belonging to HCSG that is in that party's custody, control or possession, including all materials containing Proprietary Information.

7.13      **Disclosure**. Disclosure of Proprietary Information by the Client will not be made to anyone except as necessary for performance of HCSG's Services on a specific need to know basis to those who have agreed to hold the Proprietary Information in trust and strictest confidence in accordance with the terms of this Section 7.13. The Client will take reasonable precautions to prevent disclosure of Proprietary Information to anyone without a need to know such Information.

*-SIGNATURES ON FOLLOWING PAGE-*

11

IN WITNESS WHEREOF, the duly authorized representatives of the Parties hereto have executed this Agreement as of the Effective Date.

Professional Resources Management of Rabun, LLC

Healthcare Services Group, Inc.

Signature: _Tammy Coll_
B2EDB4CAE5EA42F...

Signature: _[signature]_
ED088C0817A4404...

Name:   Tammy Coll

Name:   Matt Kirk

Title:   CEO

Title:   Regional Director

Date:   9/8/2020

Date:   9/8/2020

# EXHIBIT A

## DINING SERVICES

This Exhibit is an integral part of the Agreement and is incorporated therein, and the scope of the Services is limited to the items included in this <u>Exhibit A</u>.  HCSG may provide other services at the request of Client for an additional fee (on which the parties will agree). Such billing for any extra services will be provided separately from the monthly Service Fee billed.

## HCSG FIXED RESPONSIBILITIES

With respect to the fixed dining service HCSG shall provide:

•       Full time Account Manager to supervise the Services
•       District Manager to oversee operation
•       All staffing responsibility including:
      a)       Salaries/wages
      b)       Taxes
      c)       Fringe benefits
      d)       Company Uniforms
•       Background checks for HCSG employees, at its cost, in compliance with applicable federal and state law
•       Office supplies
•       Computer and computer related costs (hardware and software)
•       Management training and education
•       HCSG Preparation Responsibilities, as defined in more detail below

## HCSG PREPARATION RESPONSIBILITIES

With respect to food preparation for dining service HCSG shall provide:

•       Preparation of food (and personnel required to perform such services, as determined necessary by HCSG) to be served by the Client to the Facility residents/patients ("Food Preparation Services") on the premises of each Facility, including Food Preparation Services relating to therapeutic diets for patients.
    1.   For purposes of this Agreement, "Food Preparation Services" to be performed by HCSG include the following functions:
        a.   menu planning;
        b.   ordering, purchasing, procuring, handling, inventorying, and storing food and related supplies on hand;
        c.   preparing and cleaning food, and preparing and cooking meals; and

    d.  cleaning used dishes and utensils used in the preparation of the food, and cleaning and sanitizing kitchen equipment at each Facility.

    e.  HCSG will make available employee and visitor meals to follow the daily menu provided and served to residents/patients. Client shall be responsible for collection of the employee and visitor meal purchases and will retain such purchases

## HCSG VARIABLE RESPONSIBILITIES

With respect to the variable dining service, all items not included in the fixed responsibilities as outlined above and provided by HCSG will be included in the Monthly Variable Fee.

HCSG shall provide guidance and support to Client in the implementation of the HCSG Dining Program, as detailed below.

## HCSG DINING PROGRAM

The HCSG Dining Program consist of:

- Foods served at three regular meals per day, of a general type and quality as set forth in the Sample Menu attached hereto as Exhibit A-1;
- House Shakes and Frozen Nutritional Treats; and
- Therapeutic Snacks, Non-Therapeutic Snacks, and H.S. Snacks in accordance with the Snack Program attached hereto as Exhibit A-2

**<u>EXHIBIT A-1</u>**

SAMPLE MENU

DocuSign Envelope ID: B0980745-44A9-483E-9E66-5BBA4EC82497D

## **EXHIBIT A-2**

## SNACK PROGRAM

Snacks are defined as supplemental Foodstuffs that are not part of the Food Preparation Services associated with the three regular meals per day.  The HCSG Dining Program consist of the following snack program:

- H.S. Snack – 42 CFR 483.60(f) requires that snacks be made available, and this requirement has been interpreted to include bedtime snacks. The H.S. Snack program consists of the following foodstuffs:
  - o Beverages
    - ▪ 4 ounce milk (cow or non-dairy equivalent)
    - ▪ 8 ounce Lactose free milk
    - ▪ 4 ounce assorted juice cups
    - ▪ 4 ounce nectar and honey thickened juice cups
    - ▪ 8 ounce nectar and honey thickened milk
  - o Pudding and Applesauce
    - ▪ 4 ounce vanilla pudding cup (regular and/or sugar-free)
    - ▪ 4 ounce chocolate pudding cup (regular and/or sugar-free)
    - ▪ 4 ounce applesauce cup
  - o Cookies and Crackers
    - ▪ Individually wrapped assorted cookies (regular and sugar-free options). Examples:
      - • Sugar cookie
      - • Chocolate chip cookie
      - • Oatmeal raisin
    - ▪ Individually wrapped saltine crackers
    - ▪ Individually wrapped graham crackers
    - ▪ Individually wrapped peanut butter crackers

- Therapeutic and Non-Therapeutic Snacks  (commonly delivered at 10am and 2pm)
  - o Therapeutic Snack – food items provided between meals as a strategic intervention for meeting nutrition care goals.
  - o Non-Therapeutic Snack – food items provided that are not part of a strategic intervention for meeting nutrition care goals, including:
    - ▪ food items provided between meals as requested by the Resident
    - ▪ food items delivered as part of a facility specific snack program (e.g. bulk snack cart)